**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **UNDER SEAL** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 17-CR-599 (LAK) |
| | ) | |
| AVINOAM LUZON | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD**
**VARIANCE ON BEHALF OF AVINOAM LUZON**


Defendant, Avinoam Luzon, through undersigned counsel, submits this

Sentencing Memorandum. As a supplement to this Memorandum, Mr. Luzon further

submits the following Sentencing Mitigation Video, approximately 27 minutes in length.

The video will be provided to the Court and opposing counsel, and can also be viewed in

its entirety at its permanent online link:


https://vimeo.com/258744498

Password: **JudgeKaplan2018**


**MEMORANDUM**

The path of life for every person is different. We cannot know where that path

will lead.  No one can see over the mountains or through the weeds along the way.  But

eventually, slowly, painfully, through joys and sorrows each person reaches a destination.

For some they are happy with where their path took them, for others they are very

1

unhappy with where the path has taken them, and still for a few they have not decided if it is good or bad, but simply turn back towards the narrow way and start walking.

For almost everyone involved in this sentencing, the path of life has taken a sharp turn into tragic territory. Gabriel Tramiel ("Gabe") lost his life, his family has been devastated, Avinoam Luzon's family has been devastated, and Avinoam, or "Avi" as he is commonly known as, is broken. Avi, has lost so much because of a choice he made with his friend to abuse fentanyl. His severe addiction took him down a path he hoped to never be on. While the way for Avi has been difficult since early in life after his parents' divorce, bouts of depression, and chronic sickness, he was able to navigate his way to some modicum of success. From here on, the path gets more difficult and he accepts that. Avi will carry the death of his friend like a heavy stone around his neck forever. He will falter under the weight of the pain he has caused Gabe's family. He will stumble through the grief and embarrassment that has ensnared his own family, and their close-knit community in Palo Alto, CA. It will be his burden alone, and there will be very little reprieve. No matter what anyone says, Avi stands here at a crossroad with a choice to make, and he has made it.

Avi with a clear mind – the first time his mind has been free from the blinding fog of addiction in many years – and an open heart and takes full ownership of the devastation he has caused by providing his friend, Gabe, with the drugs that ultimately killed him. He cannot change the past, but Avi is determined to correct his life, seek treatment for his addiction, improve his physical health and live the remainder of his life in a way that is honorable. In fact, he has already started.

Avi started down the long road to redemption the day after Gabe passed away. Putting aside the personal considerations of what had happened, Avi contacted Gabe's wife, Becca, to warn her of the drug that was left behind.  Although he was less than candid about the specific substance, his intent was to prevent it from harming anyone else.  Admittedly, this was not a full withdrawal from his destructive activity because he continued to use drugs keeping a large supply for personal use in his dorm room.  While this may appear strange, for addicts with financial means, buying illicit substances in bulk on the dark web is commonplace. Avi was struggling more now than ever before. He could not face the person he saw in the mirror every morning. Each morning he woke up to the reality that he was responsible for the death of his best friend. In an effort to cope himself, Avi continued to self-medicate, and in a very real way Avi hoped it may kill him too.  But, as it turns out his arrest helped pull him out of his addiction, and for that he is thankful. He continued to show that he understood the situation and opened himself up again to assist.

Avi self-reported the drugs in his apartment to law enforcement.  Through his attorneys, he notified the prosecution of the drugs in his dorm and gave consent to search his room.  That was a big moment for Avi on his path to become drug-free.  He was happy to be rid of that burden.  He had made up his mind to move forward with his life. Every decision he has made from that day forward has been in line with this goal.

When Avi was released on bail in September, 2017, after a brutal unprovoked attack at MCC, he began seeing an addiction specialist, a ████████████████, attended physical therapy, and was seeking medical treatment for his █████████████ ██████  To get to the root issue of the problem, Avi began exploring his childhood issues

3

with his parents' divorce.  As a result of the divorce, Avi was forced into a role where he was a caretaker for his sisters while having virtually no relationship with his father.  This was very hard on Avi at this critical time in his life. He began experimenting with drugs, primarily with Gabe, and as time passed his addiction grew stronger.  At first it was alcohol and marijuana, but after being prescribed opiates for an injury he suffered, he found that they were wonderful for his anxiety and the pains of his ███████████. As time passed he looked to more quantity, and then more powerful drugs, to continue chasing the freedom from pain he so desperately desired.  Gabe was on a different, but parallel path that led him to also move to larger quantities and more powerful drugs. Friends for life, they found their drug taking routine comfortable and safe.

While Avi had sought assistance for some of his █████████████████, he never knew exactly the help he needed.  Intermittent therapy and drug use was his way of coping.  But, this time he has dedicated himself to serious ongoing treatment.  His drug addiction treatment involved multiple sessions per week.  Likewise, the ██████████ treatment was at least weekly.  Avi's schedule was packed with treatment sessions, doctors' visits and physical therapy for his hand injury he received while at MCC.  It appears to have had a profound affect on Avi. He received overwhelming positive feedback, and his providers acknowledged his progress, but also noted the need for ongoing treatment. For the first time in his life, Avi could see the path he needed to be on to rid himself of the chains of addiction that have bound him for almost 20 years. However, this path is not an easy one; it is a path for life. There is no end to this path. Sobriety is a choice that one must make each and every day of their life.

Unfortunately, since being remanded after his plea, Avi has received no ▉▉▉▉ ▉▉▉▉ or drug addiction treatment. He has received limited, sub-standard healthcare, and has not attended a single therapy session. While some may say that perhaps it is deserved, or "this is jail" and "what do you expect", it must be pointed out that while punishment is warranted and will be provided, cruelty is not. A lack of rehabilitation, a clear goal of our criminal justice system with virtually no teeth, does not benefit anyone. The conditions Avi has endured through his time at MCC have been overly punitive. Moving forward, Avi hopes that while he is being punished, this Court can weigh the need to rehabilitate him so that he is able to become the productive member of society everyone knows he can and will be. He needs help and he is begging for it.

To be sure, Avi took every possible step he could to begin down the new path he has chosen. He has friends and family along that path to help guide his way. The sins he has committed have been laid bare for all to see. He is an open book and hopes that this sentencing can be the closure that Gabe's family needs. He wants desperately to grow his already strong bond with his family, and rekindle the relationships with his dear friends throughout his time in custody. In the end, he knows that he must pay his debts, and through that wiping of the slate, he can begin anew attempting to honor the life he was given, through the loss of the life of his best friend.

## SPECIAL CONSIDERATIONS

### A.    Detention at MCC

The Supreme Court has recognized that because pre-trial confinement is administrative, as opposed to a judicial form of detention, the conditions of confinement

may not rise to the level of punishment. *See Bell v. Wolfish,* 441 U.S. 520. 537-38 (1971). Judge Weinstein of the Eastern District of New York Observed " The inevitable consequences of pre-trial incarceration, particularly when prolonged beyond a short period, are undeniably severe." *United States v. Gallo*, F. Supp. 320, 3336 (EDNY, 1986).   This is particularly true when an individual is housed at Metropolitan Correctional Center ("MCC") New York.

The conditions at MCC are notoriously harsh.  Courts have consistently complained of the conditions suffered by inmates there.  It is particularly true in the case of Avi because of some of the unique circumstances he faces.  His health condition and the unprovoked attack he suffered while awaiting bail in this case.

Since his arrest on February 27th, 2017, Avi was continually confined at M.C.C. for a period of approximately seven (7) months before he was granted bail. This was due largely in part as a result of a severe attack that Avi suffered at the hands of another inmate. After the assault, Avi was placed in Special Housing without proper medical follow up. That assault resulted in multiple broken bones in his left hand and a 4-inch laceration to his scalp. Avi remained in Special Housing for approximately three weeks before being assessed by an orthopedic surgeon. This lapse in care may have left him with permanent disability in his left hand. He developed chronic headaches as a result of the blunt trauma to his head during the assault and was not seen by a neurologist or neurosurgeon until he was released on bail to seek medical treatment on his own.

In addition to this horrible crime against Avi, he experienced unspeakably harsh conditions, including being forced to endure painful withdrawal symptoms without any medical attention. When he arrived at MCC he was not given any medication for his

███████████████████████████████████████████████ for a period greater than two weeks. In addition to opiate withdrawal, Avi was forced to endure the harrowing experience of a dangerous benzodiazepine withdrawal and the ████████ ██████████████████████████████████████████████████, which can be psychologically traumatic.   In short, Avi was left to suffer terrible, dangerous withdrawal symptoms with no regard for his well-being.

Subsequent to his release on bail and as a result of his remand after the plea, Avi continued again to suffer appalling conditions and lack of care.   Avi was scheduled to receive a ██████████████████████████████████████████ ████████████████   As outlined in counsel's letters to this Court, it was many weeks before a ██████████ was performed.   Even now, as this letter is being written months after remand Avi does not have the results of ██████████.   This delay in medical treatment can is negligent, at best. These personal experiences of Avi are only underscored by the generally deplorable conditions of MCC otherwise.

M.C.C. is not designed for long-term stays. *See United States v. Behr,* 2006 WL 1586563 *5 (SDNY 2006) (Sweet, J)*.  Conditions at MCC are substantially harsher than other pre-trial institutions. Inmate movement is severely restricted at all times. They have little opportunity to participate in social or educational programs, personal development programs, exercise, physical training, or recreation, and almost no chance to be outdoors. The defendant is housed in a unit consisting of 156 inmates, 26 inmates per dormitory on 13 bunk beds in an area of approximately 850 square feet. Each dorm has one toilet, one shower stall without a showerhead, and one sink that is frequently clogged and out of service due to overuse. Inmates have no ability to repair the plumbing by themselves, so

the plumbing often remains out of service for weeks on end. The bathrooms always smell strongly of urine and human feces. The dorms contain no ventilation system, and due to overcrowding it is next to impossible to maintain sanitary living conditions. The lack of sanitation is apparent due to rodent and cockroach infestation, year-round.  In *Gaston v. Coughlin, 249 F.3d at 164-165 (2nd Circuit, 2001)* the Second Circuit held that rodent infested dorms are cruel and unusual punishment. The infestation is so severe that counsel can even hear the rodents moving behind the walls in the visitation area.  It occasionally sounds like a stampede of rodent nails passing by inches away behind the concrete block walls.

Chief Justice Jack Weinstein also determined that inhumane conditions and lengthy pre-sentence detention in harsh conditions amounted to a due process violation and is therefore punishment. Judge Weinstein concluded that those subjected to the hardship of lengthy pre-sentence detention under harsh conditions may therefore be meritorious of downward departures stating, "We cannot measurably alter the conditions of pre-trial and pre-sentence detention consistent with its limited purposes, but we can alter the length of incarceration." *See United States v. Carty*, 264 F. 3d 191 (2nd Circuit, 2001)(The unusually harsh conditions at the MCC are conditions which deprive pre-trial inmates of Constitutional rights and have not kept up with contemporary standards of decency and represents substantially harsher conditions than the condition the defendant would have experienced if he had been designated at a Federal Prison Camp or a Low Security Federal Facility").

The Second Circuit, in *Mendola*, upheld the district court's decision for a 10-month downward departure on the grounds of harsh confinement at MCC in a pre-trial

and pre-sentencing setting. *See United States v, Mendola*, S2 03 Cr. 499 (KMW); *See also United States v. Mateo*, 229 F.2d  201, 212 (SDNY 2004); *United States v. Francis 129 F. 2d 612 (SDNY, 2001) (Patterson, J.) (*"Pre-sentence confinement conditions may in appropriate cases be a permissible basis for a downward departure"); *United States v. Hernandex-Santiago*, 92 F. 3d97, 101 n.2 (2nd Circuit 1996)(Downward departure of three levels based on 22 months of harsh confinement); *United States v. Lara*, 901 F. 2d 599 (2nd Circuit 1990)*(Downward Departure* from a guideline sentence of 121-151 months to 60 months based on harsh confinement).

Recognizing that Mr. Luzon may not request a downward departure, we seek a downward variance based on harsh conditions of confinement.

## APPLICATION OF THE STATUTORY SENTENCING FACTORS
## TO THIS CASE

United States Supreme Court Justice Anthony Kennedy has stated that, "our resources are misspent, our punishments too severe, our sentences too long."[1]  It is incumbent on this Court to, "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518, U.S. 81, 113 (1996).

Mr. Luzon requests a sentence of 84 months.

In the present case, the following factors must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy

---

1 Justice Anthony Kennedy, Speech at the American Bar Association Annual Meeting, August 9, 2003, http://74.125.47.132/search?q=cache:RaV8HeXt5s0J:www.supremecourtus.gov/publicinfo/speeches/sp_08-09-03.html+Justice+Anthony+Kennedy,+American+Bar+Association+meeting,+August+9,+2003&cd=1&hl=en&ct=clnk&gl=us

the purposes of sentencing:

**1.    The Nature and Circumstances of the Offense and the History and Characteristics of the Offender**

   **(a) Nature and Circumstances of Offense**

Mr. Luzon pleaded guilty to an Information.   The details of his offense are thoroughly discussed in the PSR and government sentencing submissions.   Mr. Luzon does not dispute those facts and very much accepts responsibility and regrets his actions in this case.

   1.   Avinoam Luzon in not a drug dealer.

Throughout this case, the government has suggested that Avi engaged in conduct that was more intentionally malicious than simply providing Gabe a small amount of drugs. The government is wrong. It is not true that Avi preyed on Gabe; that Gabe was a totally blameless participant; or that Avi possessed drugs in his dorm room for anything other than personal/recreational use.

Avi and Gabe were close childhood friends.   As close friends sometimes do, they got into many of the same activities.   Unfortunately, one of the activities that Gabe and Avi shared was drug use.   They often used and exchanged drugs with each other.   On hundreds of occasions they participated in taking many kinds of drugs, including fentanyl that both Gabe and Avi provided.   It was not a one-way street.   They often shared the cost and would settle up when using one another's personal product.   But, neither of them were into drugs for personal profit and they kept their sharing of drugs amongst close friends.

To be clear, Avi was a severe drug addict, and so was Gabe.   It is reflected throughout texts turned over during discovery.   They used drugs of all kinds together and

separately.  Neither was co-dependent, but they were friends who shared a common interest.  But, Avi lived alone, was able to maintain more drugs on hand without fear of a loved one finding them, and was engaged in a cycle of self-medication for physical and psychological pain he has suffered for many years.  The government has no proof and cannot in good faith proclaim that Avi was a commercial drug dealer.  He was not.  To illustrate the point, Avi tested positive for a number of controlled substances on the day of his arrest.  He was self-medicating with significant amounts of fentanyl prior to his arrest.  The fentanyl substance found on his person, and in his dorm were not pure.  They were a mixture containing fentanyl and was premixed for Avi's personal use as evidenced by the spray bottle found on his person when he was arrested.

Gabe was not persuaded or forced by Avi, he was a drug addict that asked Avi to provide him with fentanyl for over a week.  The night of Gabe's passing, Avi used with him.  The circumstances are tragic and Avi certainly would take it back if he could.  But, their friendship, his addiction, the long history of recreational use with his friend and the belief that his friend would be responsible with the drug as he had been in the past lead Avi to underestimate the situation.  In the end the worst outcome imaginable happened.  Avi would have preferred to take his friend's place, but the decisions made by Avi and Gabe led to a tragic result.[2]

Avi recognizes his errors.  He accepts full responsibility for his actions.  He owns his shortcomings.  He hopes the facts help set the record straight.  Avi is here because of a terrible decision he made to share drugs with his very dear friend, and has never and

---

2 None of this is said to demean Mr. Tramiel, who by all accounts was a good person and whose drug addiction was one small part of his life. But, an honest evaluation of Mr. Tramiel's disease is required to correct the current record that wrongly suggests that Mr. Luzon is solely to blame for Mr. Tramiel's consumption of fentany.

will never, be a commercial drug dealer.

2. Gabe Tramiel is a drug addict.

Gabe was a drug addict. The letters submitted by those who know Gabe well demonstrate the depths of his undiagnosed and untreated drug addiction and his ability to hide it from his family and friends. A common theme among the letters submitted in anticipation of sentencing is that Gabe's own addiction fueled the tragedy. Gabe was better equipped at hiding his addiction than Avi, but ultimately Gabe's behavior revealed the severity of his struggle with opioids.

Only now, after the tragic ending to his life, have Gabe's friends recognized the extent of his addiction. Mr. Oren Brimer, Gabe's best friend, wrote, "[Gabe] was the guy who would always take the extra hit, snort instead of swallow, and see just how far he could push it… Gabe did drugs, knew the consequences, knew what pushing it could mean for his friends and family, and still persisted." *See* Oren Brimer Letter. Mr. Brimer continued, "Clearly Gabe wasn't only hiding his issues from me, his family and his friends, but also from himself." *See* Oren Brimer Letter.

The most tragic manifestation of Gabe's addiction is that it prevented Avi from obtaining the substance abuse treatment he so desperately needed, and by extension also prevented Gabe from treating his own addiction. A few years before Gabe's passing a group of Avi's closest friends planned an intervention. Unfortunately, Gabe used his charisma and influence to prevent the intervention from occurring. Many of those closest to Avi and Gabe reflected upon this event in their letters. Avika Leeder wrote, "Looking back, I can't help but think that Gabe was partly motivated by a desire to continue his opiate related relationship with Avi." *See* Avika Leeder letter. Oren Brimer reflected, "Many of our fears about Avi were abated by Gabe who assured us that Avi had his drug use under control. Sadly, we now know that Gabe did so most likely to protect his co-addict, his support network for his own addiction." *See* Oren Brimer letter. Yair Tygiel relied, "Gabe, who was Avi's good friend and – as we have learned – his enabler,

diverted our conversation.  'Can't a guy just do drugs?' he joked."  *See* Yair Tygiel letter.

Many of Gabe's closets friends blame themselves for not identifying his addiction sooner.  Avika Leeder wrote, "What if we had realized that Gabe's recreational opiate use was really an opiate addiction in disguise?  If Avi never supplied Gabe with Fentanyl, would the incredibly resourceful Gabe I knew have found another source?"  *See* Avika Leeder letter.  Oren Brimer specifically stated that his letter was designed to give your Honor a holistic view of Gabe, which includes an examination of Gabe's addiction.  He wrote, "The purpose of this letter is [to] tell you[r Honor] some stories about Gabe that will give you a fuller idea of who he was in regards to his addiction that led to his death, and to show that Avi's crime, while severe, was a terrible accident and a sad consequence of two people's addiction.  These stories about Gabe's decline into life-ending addiction aren't intended to demonize him…  He was the most charismatic, loving, caring man I've ever met, but to ignore his flaws and his own responsibility in his own death would be unfair."  *See* Oren Brimer Letter.

The extent of Gabe's addiction is reflected in the text messages he sent Avi in his search for drugs on the fateful night.   At approximately 6:43 p.m. on October 22, 2016, Gabe texted Avi:

> *"I love you.  Remember you are doing this for your asshole friend.  You are strong and on an amazing path.  Don't let something stupid get in your way.  Drop off at my house and go home.  Take a car to stop your temptation."*

Six minutes later, Gabe, getting increasingly anxious about when his drugs would arrive again texted Avi, *"Don't sketch out later!  Mission time."* Approximately four hours later, Avi wrote to Gabe, *"I love you too man, but [I'm] not doing this again, too tempting."*  Gabe responded, *"I get it and really appreciate it.  It's good it is not in a spray bottle!"*  Avi, wanted to emphasize the power of the drugs and ensure that Gabe understood that they were intended to be used over the course of months.  He wrote,

*"This should last you 2-3 months."  See* Text Messages.  Tragically, Gabe did not heed Avi's final piece of advice.

Those closest to Gabe have been exposed to a side of him they did not know existed until after he died.  Yair Tygiel in reflecting upon the text messages between Avi and Gabe on the tragic night wrote, "I was shocked to see in them a Gabe I didn't know; a person pleading with Avi for drugs that Avi didn't want to supply."  *See* Yair Tygiel letter.

Avi's statements to his family corroborate that he did not want to provide Gabe with drugs on the tragic evening.  Mr. David Khan, Avi's stepfather relayed a conversation he had with Avi in which, "He told us that he gave drugs to Gabe because Gabe begged him to do so, and that Gabe had overdosed.  He was anguished.  We were all in shock."  *See* David Khan letter.

Gabe was a severe drug addict.  Gabe had effectively blocked Avi's support network from confronting Avi about his addiction, so that he would continue to have a partner in drug abuse.  Gabe knew that if Avi Luzon beat his addiction, then he would have to address his own drug addiction, and that was a path Gabe was not prepared to take.  Sadly, Gabe's inability to confront his own addiction, ultimately played a significant part in his untimely death.

3.  Mr. Luzon's offense conduct.

On October 22, 2016, Gabriel Tramiel ("Gabe") began exchanging a series text messages with Avinoam Luzon ("Avi") starting around 3pm earlier that afternoon.  These messages continued for the next eight (8) hours. Gabe wanted Avi to get him Fentanyl so that Gabe could sneak out of his house and get high without his wife, Becca, discovering his absence. Prior to this evening, for the weeks leading up until this point Gabe had been telling Avi that he wanted Avi to get him some Fentanyl. On this fateful night, Gabe was out of drugs, which only intensified his desire to obtain more narcotics. Avi had been

14

trying to distance himself from his group of friends whom he regularly abused drugs with. Avi was struggling with his addiction and he knew that as long as he continued to hang out with this group of friends, he would not be strong enough to abstain from doing drugs with them. To this end, Avi had been ignoring calls from these friends. However, on October 22, 2016, Avi took Gabe's call. None of these friends were as close to Avi as Gabe was. They were best friends, and were actually considered to be more like brothers, by everyone who knew them. Avi made it clear to Gabe that he did not want to provide drugs for him, but Avi could discern the pain that Gabe was in, and after much cajoling by Gabe, Avi finally relented and agreed to provide Gabe with some of the Fentanyl that Avi had. However, Avi did not let on to Gabe that he had any Fentanyl. Instead, Avi concocted this story that he had to meet up with a dealer in Long Island to obtain the drugs. He did this in hopes that Gabe would see how much of a hassle it would be for Avi to obtain the Fentanyl. Avi had hoped that duration of time it would take to procure these drugs would have swayed Gabe to tell Avi to forget it.  Gabe did not give up. He told Avi he would wait for him to get the drugs and they would meet up.

Avi, for all of his great attributes, one of his greatest attributes is also one of his weakest – his desire to please others. Avi wanted to please Gabe. He loved Gabe like a brother, and he wanted to give Gabe what Gabe wanted. Avi's own addiction to drugs had clouded his judgment for so long that it was not the mind of a "trained medical doctor" who prescribes medications for patients, but rather it was one drug addict who suffers from the chains that bind an addict, trying to help ease the pain of another drug addict. Avi texted Gabe and told him that he would take the Fentanyl to Gabe's apartment in Brooklyn and leave it for him in a closet. This was done at Gabe's request (see text

15

message dated October 22, 2016).  Gabe later changed his mind and realized he could not wait until the next day to get the drugs from his house in Brooklyn, so he asked Avi to come to Gabe's in-laws' apartment on the Upper West Side, in Manhattan. Again, Avi reluctantly agreed to do this and Gabe was overjoyed. Gabe knew that Avi was struggling with his addiction and Gabe, in an attempt to assuage Avi to continue on his way to Gabe's in-laws' apartment, told Avi that he was going to do something really nice for him later on. He had recognized, or at least intimated that Avi was doing something that he did not want to do and Gabe was going to do something nice for him in the coming days or weeks.

Avi continued to text Gabe back and forth over the next few hours. Avi at one point tells Gabe he is done giving him drugs. Avi texts, Gabe, "*I love you too man, but im[sic] not doing this again, too tempting." Id.* Avi went a step further and reassured Gabe that the Fentanyl he was bringing should last him "*2-3 months" id.* Once Avi met up with Gabe, Gabe convinced Avi to go to a diner with him and get some dinner. During the dinner, Gabe got up to use the restroom and when he returned, it was obvious to Avi that Gabe had used the nasal sprayer with Fentanyl in the bathroom. Avi told him that he needed to be careful with it and not over do it or it would kill him. Gabe laughed it off and reassured Avi that he knew what he was doing and he would be fine. The two friends finished their dinner and they left together. As they were saying goodbye to one another, Gabe told Avi he loved him and gave him a hug. That would be the last time that Avi would ever see Gabe alive again.

Gabe walked in to the apartment he was staying at with this wife, Becca, and their daughter, ███████. On the surveillance video we have seen (see Govt. discovery), Gabe

is seen walking to the elevator in a normal manner. Once inside the elevator, Gabe takes the nasal spray bottle and inhales the Fentanyl mixed substance twice.  Each inhale alone was likely long enough to kill him. He did it again and then walked out of the elevator and walked down the hall to the entrance of the apartment. That would be the last time anyone saw Gabe alive.

The next morning, a mutual friend of Avi and Gabe alerted Avi to Gabe's death. Avi told this to his mother who was in town and visiting. Avi told his Mom he needed to contact Becca and tell her about the nasal spray bottle he had given Gabe the night before. Avi said it was his fault that Gabe was dead and he feared that if the nasal spray bottle was not found, perhaps Gabe's daughter █████ could happen upon it and she too could die. Avi insisted that he needed to call Becca right away to inform her. Avi's mom told Avi that if he did so, it would open him up to potential criminal liability and he needed to stay quiet and just leave it alone. Her motherly instincts had consumed her and she wanted to protect her son from a day like March 21st, where she would see her son sentenced for his involvement in Gabe's death. His mom wanted to protect him in a way that only a mother could justify. Avi knew what would happen if he contacted Becca and told her everything. Avi also knew that his own life was less important at this point than an innocent child whom Avi loved as his own. Avi made the call and told Becca about the night before with Gabe. He told Becca it was his fault that Gabe was dead. Six months later, Avi was arrested for his involvement in this case.

### 4.   (b) History and Characteristics of Mr. Luzon

From the outside looking in, Mr. Luzon's life seemed wonderful.  He grew up in a close-knit, upper-middle class neighborhood, had a group of good friends and succeeded

academically.   As pointed out in numerous statements, and as described by the government, Mr. Luzon was a "doctor."  But, Mr. Luzon's life has been complicated by a series of setbacks that were outside his control.  No doubt, he made a multitude of unfortunate and ill-advised choices in his life, the events of this case being the single biggest.  However, the road that led Mr. Luzon here is winding and not nearly as simple as the government would have you believe.

It is difficult to imagine the regret Mr. Luzon shoulders as a result of his decisions.  He recognizes that many people lost someone very special in their lives.  Unlike in most cases, though, so did Avi.  Gabe was one of his very best friends.  They had known each other since childhood.  They had taken trips together, gone to Synagogue together, and experienced all of life together, good and bad.  No one wants to be here, but Mr. Luzon especially did not want to be here bearing full responsibility for the loss of his friend, the effects on his friend's family, and the hardships on his own family. The choice he made, and the struggles he has endured have been compounded by the very real consequences of his actions that have already affected his future career and will lead to immeasurable time lost in prison.  He stands before this Court humbled, sorrowful, swirling with emotions, and ready to face what is ahead of him in hopes of making amends for his actions and getting the help he needs to be the person he is certainly capable of being.

1. **The Hardships Mr. Luzon Experienced Contributed to His Addiction.**

Although Avi grew up surrounded by close friends, family, and a stable community, he has suffered as well. His parents divorced when he was nine years old, and his father was relatively absent as a father figure. According to his cousin, Dov Tamler. After his parents divorced, Avinom "assumed a paternal role with his two younger sisters, and he

did this to the best of his ability." *See* Letter of Dov Tamler. During this time, "[h]is

materal grandfather, Bob Imberman was his emotional support and mentor." *See* Letter of

Nancy Eiger. When his grandfather passed away it left a void in Avinoam's life. *Id.*

Everyone who knew him remembers his deep desire to pursue a career in medicine

since his childhood. "Avi wanted to become a doctor because he wanted to do good, he

wanted to use his intelligence for good. *See* Letter of Yair Tygiel. Unfortunately, he

encountered several obstacles along the way, which inevitably eliminated his chances of

becoming a medical doctor. "Despite a strong MCAT score and good GPA, he had

difficulty getting into medical school." *See* Letter of Adam Karz. He finally decided to

attend medical school in the Caribbean where he graduated at the top of the class, but

again he was not accepted to his residency program of choice, Emergency Medicine, and

instead matched into Family Medicine. *Id.* Although he is described by a fellow resident

as "an exceptional intern" and "one of the brightest residents in his class," he was

dismissed from his residency program. *See* Letter of Aaron Rosenberg. He applied to

other residency programs, but was unable to secure another residency. *Id.*

Understandably, Mr. Luzon suffered from a period of depression following his

dismissal from residency and inability to obtain another placement, effectively

extinguishing his hopes of becoming a doctor. Dr. Rosenberg recalls that "[h]e was

devastated when he lost his residency and he told me may times that he was suicidal."

Around this time he was diagnosed with ████████████, which is when he began to

regularly use pain medication. *See* Letter of Cassandra Lehman. "The subsequent

traumatic development of ████████████████████████████████████,

prolonged his use of pain medication." *Id.* At the same time, he began a master's program in Public Health at Columbia University. *Id.*

As an aspiring member of the medical community, who had completed medical school, and some residency, many of Mr. Luzon's character letters mention their familiarity with the addictiveness of opioids, and the behavior of an addict. They express a belief that Mr. Luzon's actions were motivated by his addiction, absent any malicious intent.

2. **Avinoam Luzon is a Natural Caretaker, Going Above and Beyond to Care for Others.**

Nearly every letter written by Avi's friends and family attesting to his character mentioned his caring nature. A common theme was that Avi wanted to be a medical doctor since the time he was a child, and that his personality perfectly fit this aspiration. Mr. Bruce Furman wrote that "there was a synergy between his chosen career path and his nature – part of his nature was to help and heal people." *See* Letter of Bruce Furman.

Several letters mentioned incidents in which Avi had personally helped the writer, where they felt that his assistance made a tremendous impact on their lives. Hugo Groening, a friend from college, recounts a time that Avi comforted him after Hugo lost a grandfather-like figure in his life while going through a breakup at the same time and saved his life:

> "Avi heard and checked on me. To this day, I believe he saved me. He rescued me from taking my own life. He helped me look at my life in a new way, and showed me how blessed I was to have the life I had…. I don't know what I would have done if Avi was not there. That was by far one of the most emotional destructive states I have ever been."

*See* Letter of Hugo Groening.

Aaron Kheifets, a friend of Avi's since high school, as well as Talia Davidow, a friend of over 25 years, notes that the message on his answering machine instructed callers to "be well." Kheifets notes that Avi genuinely cared how someone was when he asked how they were doing. He mentions that "[t]hough Avi's father was ready to set him up with an easy and profitable career in real estate, Avi fought tooth and nail to become a doctor instead because he cared so much about wellness." *See* Letter of Aaron Kheifets.

His stepfather, David Kahn, mentions a time when a family friend's husband was dying, and Avi consoled her. "Avinoam provided support to the wife and helped her accept that the best thing to do was to refrain from taking measures to prolong his life." *See* Letter of David Kahn. This friend, who has known Avi since he was a child, also mentions this incident in her letter:

> It was Avinoam's help, guidance and knowledge that helped me take my husband off of life support. Avinoam stayed at the hospital with me until Gary had passed and drove me home much later after the mortuary was arranged for. If it wasn't for Avinoam I would have not been able to make the decision that I did.

*See* Letter of Nancy Eiger.

> Avinoam's aunt recalls when her father-in-law died,

> my mother-in-law was bereft … Avinoam volunteered to sleep over and just be there for her, as someone who could help her calm down when she suffered from panic and anxiety attacks in the middle of the night. He slept on an air mattress on the floor, was awakened in the middle of the night to care for this 95 year old woman, and did it all with a smile and warmest attitude.

*See* Letter of Nancy Tamler. Avinoam was not related to his aunt's mother-in-law, yet his caring spirit is evident in his desire to console a widow in need of companionship.

His classmates during residency and medical school were impressed with Avi's dedication to caregiving and enthusiasm for the practice of medicine. Dr. Aaron Rosenberg, who Avi met during residency, felt that Avi excelled in medical school because of his caring nature, and that these attributes also made him an exceptional intern during residency.

> Avi was an exceptional intern not only because of his intelligence but because of his kindness. I can remember many instances where Avi's interventions saved lives that may have not [sic] been saved without his kindness and brilliance… I cannot count the all [sic] times that I can remember Avi comforting dying patients or families who were suffering. I remember being able to trust Avi as 'my' intern, to trust that he would take care of our patients as well or better than I would. I never had to worry about my patients when I was working with Avi.

*See* Letter of Aaron Rosenberg.

A medical school classmate, expressed that he "had never seen someone as energetic and committed to medicine as he was. He routinely studied concepts that would never be tested just for the sake of learning." He goes on to mention "Avi was routinely the first person to help in any situation that called for assistance." *See* Letter of David Kemple.

Shoshana Leeder recalls Avinoam comforting her and preparing her for a major medical procedure:

> One month before undergoing my 2nd open-heart surgery, Avi sat down with my mom and me and went over all the details of what was about to occur. Avi in no way needed to spend as long as he did that night. I remember so clearly Avi's ability to be real about the seriousness of the surgery and yet he had an incredible gift of calming my fears.

*See* Letter of Shoshana Leeder.

Avi was an individual with a caring nature, whose desire to help people went awry when his friend begged him for help to ease his pain. All who he encounters have been impressed with his caring nature and desire to help others.

### 3.  Mr. Luzon Would Never Have Intentionally Harmed His Friend.

Many of Avi's friends cite his caring nature as his downfall, and the reason he gave Gabe the drugs that led to his death. Mr. Kheifets describes the close-knit group of friends that he, Gabe, Yair, and Avi belonged to. "Gabe felt safe using with Avi because Avi is such an accepting, giving person." *See* Letter of Aaron Kheifets.  Mr. Kheifets is certain that Avi will carry emotional scars for the rest of his life "for having anything to do with Gabe's death," and is "certain that some part of [Avi] blames himself." *Id.*

Jason Wynne, a friend from college states that "[Avi] never once, in my 15 years of knowing him, would ever say no to a friend in need. It seems that that characteristic held true in this instance – he succumbed to his friend's requests to get him drugs." *See* Letter of Jason Wynne. Mr. Wynne believes that the loss of Avi's friend is the worst punishment he could receive. *Id.* The Rabbi of the Synagogue in which Avinoam grew up, believes that Avi "will carry the awful memory of the consequences of his decision for his entire life." *See* Letter of Sheldon Lewis. A friend of Gabe and Avi's from high school, insists that "Avi and Gabe loved each other as brothers, and I believe [Avi's] heart is breaking having lost this lifetime friend." *See* Letter of Taneisha Berg. She goes on to say that Avi "is a deeply sensitive, caring person, who truly loved his friend Gabe – unfortunately this also meant sharing in destructive behaviors together." *Id.*

Leila Van Gelder, who has known Avinoam since he was a child, highlights the fact that despite Avi's devastation at learning about Gabe's death, he had the foresight to call

Gabe's wife and instruct her to protect her child from potential danger, lest the child get hold of the bottle of fentanyl Gabe had overdosed with. *See* Letter of Leila Van Gelder. She believes this is characteristic of Avinoam, to put the safety of the child first. *Id.* A family friend, Rabbi Amy Eilberg also felt that "in that moment, Avinoam's values and caring came to the fore, and he wanted to be sure that no more harm would befall the family of his friend." *See* Letter of Rabbi Amy Eilberg. She believes that Avinoam's actions in protecting his friend's child "provides a glimpse of the kind of positive contributions he will make to society when this long nightmare is finally over." *Id.*

His sister, Talia Lozon, describes Avi's decision to give Gabriel fentanyl on the night of Gabe's death as "an example of my brother acting selflessly. Gabe wanted the drugs and [Avi] wanted to help him." A member of Avi's close-knit group of friends, believes that "[w]hat has happened to one of [Avi's] best friends as a direct result of their shared addiction must be destroying him. Like all of us, he loved Gabe and will mourn him for the rest of his life." *See* Letter of Yair Tygiel.

His friend, Joseph Goldenberg, insists that "Avinoam never intended anything to happen to his best friend Gabe. Avinoam's actions and words demonstrated that he was a thoughtful and caring person, not a reckless person with harmful intent." *See* Letter of Joseph Goldenberg. Although Mr. Luzon supplied Gabe with the drugs that caused his death, his intention was to provide a friend in pain with the medication he desired to ease the pain. "Losing a friend and spending nearly a year behind bars, Avinoam has already been punished severely." *See* Letter of Yaacov Tygiel. Mr. Luzon has suffered tremendously, for the death he caused was not that of a stranger, but that of his best friend.

He most certainly regrets this decision, and will have to live without his friend, and with the knowledge that he is responsible for Gabe's death, for the rest of his life.

4. **Mr. Luzon Needs Rehabilitation.**

A childhood friend of both Avi and Gabe insists that "Avi's mistake was a direct result of his addiction, and putting him in jail would do nothing to address the underlying issue. Avi's incarceration would not give solace to the bereaved. No one would benefit from it." *See* Letter of Yair Tygiel.

Another childhood friend reiterates that "Avi doesn't need 20 years behind bars – Avi needs rehab. Avi is a guy with such potential that made stupid choices because of an addiction. I am confident that when his successfully rehabbed he will be able to be a positive contribution to society." *See* Letter of Akiva Leeder.

Harry Kurland, who grew up with Avi in the same community and synagogue, and who is a self-described recovering alcoholic, cites his own experience as an addict, and his recovery process, arguing that "[a]ddicts need help, Avi needs help. Spending the next 20 years in prison, disconnected from his family, and friends and the people who love him will not help Avi attain sobriety and free himself from the shackles of addiction." *See* Letter of Harry Kurland. Ms. Davidow describes Avi as

> a person with tremendous capacity to help and heal. He does not deal drugs, He does not have a history of violence or any other indication that he will cause harm in this world. He is devastated by the loss of his friend. And he is someone who has avoided addressing his addiction for years, convincing all of us that he was fine.

*See* Letter of Talia Davidow.

His uncle writes that:

> Avinoam is a good person who got into trouble with substance abuse that greatly affected his judgment. In my

> humble opinion we need to get that stuff out of his life.
> Punishing Avinoam is not the best-case scenario for the
> community-at-large. We should be looking at how to best
> benefit society. Avinoam should be required to spend a
> significant amount of time in a rehabilitation program with
> continuing supervision. This would enable him to continue
> to be a contributing member of society rather than a burden
> on society.

*See* Letter of Larry Imberman.

Dr. Rosenberg requests that the Court "consider helping Avi to receive the treatment that he needs" and insists that such treatment will give Avi "the tools and space he needs to recover and reintegrate into society." *See* Letter of Aaron Rosenberg. His sister Talia pleads: "My brother is a drug addict. I ask that you recognize that in his sentencing. He should be treated for his addiction not punished. He was put on this earth to do more good." *See* Letter of Talia Lozon. Sooze Protter, who has known Avi his whole life, describes Avinoam as "an addict, not a criminal. He needs to be in a rehab facility, not a prison." *See* Letter of Sooze Protter.

All of the letters, which insist that Avi needs rehabilitation instead of prison, highlight his caring nature, and the great amount of good he has already contributed to society in his short life. All feel he has great potential for positive contribution after he is allowed recovery time.

### 5. Mr. Luzon is Dedicated to His Friends, Often Putting Their Needs Before His Own.

"He cares a lot about his friends and family members, to the point that he would make sacrifices and would put other problems as priority ahead of his own issues. He wants others to be happy and free from suffering. He genuinely wants to make everyone feel taken care of." *See* Letter of Hugo Groening.

26

Stanley Shapiro, a college friend, recalls a time 2 years ago when his father was facing serious back surgery. When he called Avi to get his advice, "[Avi] told [him] he was on his way, and shortly thereafter showed up. He spent hours helping me to understand the procedure, the information that the doctors gave us, and the trade-off from doing the surgery versus holding off." *See* Letter of Stanley Shapiro. Similarly, when Joseph Goldenberg spent two weeks in the hospital and had to withdraw from college for a quarter to recuperate from a traumatic accident, he recalls "Avinoam was critical for my recovery. He visited me at my parents' house almost every day. In fact, he was the only one who made a point to see me on a near daily basis." *See* Letter of Joseph Goldenberg.

His friend Raphael, whom Avinoam was close with in grade school, but from whom he drifted apart in adulthood, recalls that Avi "had a tendency to look out for others and make sure people were being taken care of. I remember starting at a new summer camp where I knew no one and I was too shy to introduce myself. Avi, who had been there before, made it his business to take me under his wing and make sure I was never alone." *See* Letter of Raphael Bob-Waksberg.

Rabbi Lewis describes Avi as a "devoted friend" to a close-knit group of friends from high school that he remained close with throughout adulthood. *See* Letter of Sheldon Lewis. Mr. Kheifets describes their group of friends as "practically brothers. No girl ever came between us, no money troubles were large enough to register even a blip in comparison to our friendship." *See* Letter of Aaron Keifets. Mr. Tygiel described the group of seven young men, who were friends since they were children, as his family. *See* Letter of Yair Tygiel.

Ms. Davidow, remembers looking up to Avi as a big brother, and "taking long walks together at summer camp, sharing my excitements and worries, knowing I was safe and would be met with acceptance and love." *See* Letter of Talia Davidow. She recalls that "[t]ime and time again Avi has put the needs of others' above his own, which is one of the reasons he didn't get the help he needs sooner." *Id.*

Many of Avi's friends characterize him as a friend who was able to make them feel welcome in a new place, and introduce them to new friends. *See* Letters of Jamie Cohen, Hugo Groening, and Jason Wynne.

**6. Mr. Luzon is Similarly Dedicated Toward His Family, and Goes to Great Measures to Show His Affection.**

Regardless of how close his relationships were with different family members, Avi remained dedicated and reliable. Several letters mention Avi's dysfunctional childhood, and the supportive role he played in keeping the family together. Mr. Leeder describes Avi as "the glue that binds together his immediate family. Both his sisters and nephews miss him dearly and are panicked by the prospect of losing him." *See* Letter of Akiva Leeder.

In her letter, his youngest sister Talia has described the impact that Avi's incarceration has had on her mental condition:

> Since my brother has been in prison, my illness has been much harder to manage and I have been hospitalized twice. I have had thoughts of suicide thinking about having my brother taken away from me for 20 years. I need him. He is my support system. If he is in jail, that will have a major impact on my mental health issues.

*See* Letter of Talia Lozon.

After spending his first Passover seder away from his family, Avi and his friend "decided to drive through the night and surprise his family in the early morning." *See*

Letter of Ben Weinrib. Although he has not had the best relationship with his father, when his father needed major surgery, "Avinoam arranged to drive his sister overnight to arrive prior to the surgery. He stayed with his father 3 days by his bed until his condition stabilized." *See* Letter of Cassandra Lehman. He also arranged a multi-leg flight to Israel, while he was a medical student in the Caribbean, to ensure that he could attend his sister's wedding. *Id.*

Avinoam's sister describes her brother as one of the only stable forces during her childhood and as "totally selfless." She notes that he "helped [her] deal with her illness in the following ways. He was [her] advocate for finding an amazing psychiatrist. He found [her] a doctor who specializes in depression with young adult women." *See* Letter of Talia Lozon. She describes his dedication to making sure that she ate when she lost her appetite as a result of depression, cooking her food and even using "food stamps to buy the ingredients because he was not working at the time." *Id.*

His aunt remembers that when Avinoam's parents divorced, "when he was only nine years old he tried to 'man-up' and be his mother's support for his two younger sisters." *See* Letter of Nancy Tramler. His cousin notes that Avi "demonstrated maturity and reliability in numerous visits and babysitting sessions with my children, ages 5 and 3… He house-sat for us on various occasions and managed our house when we rented it while out of town…. He never asked for anything in return, and rejected my offers to compensate him for time and energy." *See* Letter of Yoni Tamler. Yoni describes Avi's generosity with his time and attention, specifically in doling out "comprehensive, thoughtful and nuanced" medical advice. *Id.*

Avi's close relationship with his family is evident in the impact that his arrest and potential sentence has had on his sister and mother. His uncle has expressed a fear that Avi's mother "would [n]ever completely recover from this loss" of sending her son to prison, also noting the already damaging effect his arrest has had on his younger sister Talia. *See* Letter of Howard Tamler.

In all described interactions with those he cared about, Avi put others' needs before his own, refusing acknowledgement or compensation. His desire to be a healer from early on in life surprised no one. His nature is to be giving, and he gives to those who surround him. He has already suffered tremendously at the death of his friend. He has suffered a painful childhood, and encountered insurmountable obstacles to achieve his dream of becoming a physician. Avi would best benefit from a rehabilitation program, rather than extensive prison time. He has already been penalized with the loss of his friend's life, loss of his aspired career, and suffering from addiction. Avi is not a drug dealer, he is a caring individual who helped his friend in pain. Such an individual, after proper rehabilitation, should be allowed to return to society, and continue to contribute his caring nature to the world. Avi's friends and family are confident that, given the opportunity, he will continue to help people and touch lives with the good deeds he can perform in the future. "It would be a great loss to remove him from his family and community with a long incarceration." *See* Letter of Jill Chesler. The amount of friends and individuals from his community who are willing to attest to his upstanding character is indicative of the strong support system he will have on his road to rehabilitation and recovery. He has a greater chance than most, because his whole community is behind him, hoping to see him changed and successful.

30

Avi should be judged on the whole of his life.  He wants an opportunity to live a law-abiding life, where he can work to correct the missteps he has taken.  Judge Rakoff, says:

> [S]urely if every man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed the Courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp. 2d 506, 513-14 (S.D.N.Y. 2006). Mr. Luzon has already taken numerous steps to get his life on track.  His successes since this case started are encouraging.  Although he is currently in custody, while on bail Mr. Luzon faithfully attended drug treatment, physical therapy, group therapy, psychological treatment, and medical appointments. His decisions in the past were poor, but his resolve moving forward is clear.  Mr. Luzon has started the long road to recovery.  He is determined to make his life what he always hoped it would be, and to honor the memory of his friend in the ways that he can.  In many ways Mr. Luzon owes his own life this horrible tragedy, even though he wishes he could trade places with Gabe.  With the proper treatment, a clear plan and support of friends and family, Mr. Luzon is redeemable and can do many honorable things with the remainder of his life.

As further explained below, the sentencing factors found in 3553(a) weigh in favor of a sentence of 84 months, which is sufficient, but not greater than necessary to comply with the sentencing factors found in 18 U.S.C. 3355(a).

**2.      The Need for the Sentence Imposed To Promote Certain Statutory Objectives**:

**(A) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense**

Section 3553(a)(2)(A) requires the judge to consider "the need for the sentence[3] imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A sentence that is excessive considering the seriousness of the offense promotes disrespect for law and provides unjust punishment. The purposes set forth in § 3553(a)(2)(A) are generally referred to, collectively, as "retribution," which has been defined as follows:

> First, retributive, or "just deserts," theory considers only the defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Second, retribution examines the actor's degree of blameworthiness for his or her past actions, focusing on the offense being sentenced. . . . Third, the degree of blameworthiness of an offense is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity.

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).

---

3 The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself. 18 U.S.C. § 3561. Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant. USSG, Chapter 5, Part B - Probation, Introductory Commentary.

When looking at these factors, this Court should consider the following:

    a.  Mr. Luzon has taken steps to correct his behavior and rehabilitate himself.

    b.  Mr. Luzon performed flawlessly on pretrial release.

    c.  Mr. Luzon was prompt in his admission of guilt.

    d.  Mr. Luzon self-disclosed the drugs in his dorm room.

    e.  Mr. Luzon self-reported the incident to Mr. Tramiel's family.

Judges must now consider *all* of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" permit or encourage only prison. *See Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 602 & n.11 (2007).  The court, in determining **whether** to impose a term of imprisonment, and, **if** a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.  18 U.S.C. § 3582(a) (emphasis added).

The Supreme Court in *Gall* recognized in *Gall v. U.S.*, 552 U.S. 38, 128 S. Ct. 586, 595-96 & n.4 (2007), that in some cases, "'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.'" *Id.* at 599 (quoting district court opinion).

Catherine McVey, Chairman of the Pennsylvania Board of Probation and parole, echoes the reasoning in *Gall,* saying:

> So the issues for us are: Who should we incarcerate? How many people should we incarcerate? For how long should we incarcerate them? And when we think about that, we want to think about what are the objectives of incarceration? The alternative to incarceration is in part an outgrowth of our focus on outcomes. As we focus on outcomes, the emphasis begins to recede from an issue of pure punishment objective, and we begin to then transition to the thoughts of what works to change offender behavior.

*Proceedings from the Symposium on Alternatives to Incarceration* at 10 (July 14-15, 2008), *available at* http://www.ussc.gov/SYMPO2008/Material/02_FINAL_Overview %20of%20Alternative%20SentencingOptions.pdf

Former Deputy Attorney General James M. Cole spoke at the New York City Bar Association.   His message involved the movement to smarter sentencing for drug offenses, and he focused on the "crushing prison population."  He said:

> While the United States comprises only five percent of the world's population, we incarcerate almost a quarter of the world's prisoners.  And while the entire U.S. population has increased by about one-third over the last thirty years, the federal prison population has increased at a staggering rate of 800 percent—currently totaling nearly 216,000 inmates.  It currently operates at 33 percent over capacity system-wide, and in the high security prisons the overcrowding rate is even higher.  We have a greater percentage of our population in prison than any other industrialized country, and the cost to maintain this is unsustainable.

Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 7 (2010), available at http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf.   Thus,   when

prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society.  *Id.* Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.  *Id.*

Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 7 (2010), available at http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf.    Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society.  *Id.* Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.  *Id.*

Mr. Luzon is 33 years old, a first offender, has been employed throughout his adult life, and has a post-graduate education. For all male offenders in Criminal History Category I recidivism rates are 15.2%.  For those who have been employed, the rate is 12.7%. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism*]. Offenders like Mr. Luzon with zero criminal history points have a rate of recidivism half that of offenders with one criminal history

point. *See* Sent'g Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter *First Offender*].

The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *See First Offender* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"). The Commission has not implemented any such revisions to the criminal history guidelines, but has recently stated that they "may be relevant" in granting a departure. USSG § 5H1.1, p.s.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Luzon, this Court should consider the statistically low risk of recidivism presented by his history and characteristics. *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

"The federal criminal justice system simply is handling an increasing proportion of a decreasing number of criminals in the United States and imposing increasingly

severe penalties upon them."  U.S.S.C., *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform*, at 39 (Nov. 2004), *available at* http://www.ussc.gov/15_year/chap2 .pdf.

Because of his relative youth, and promise for rehabilitation from crime, Mr. Luzon should receive 84 months in prison.  Congress has directed that a prison sentence is not a means of correction and rehabilitation.  Mr. Luzon realizes that he has participated in this offense and must be punished; however, his request to this Court is that he be "corrected and rehabilitated" and allowed to become a productive member of society.

Therefore, a sentence of 84 months is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

**(B) to afford adequate deterrence to criminal conduct**

Deterrent effect on the general population is generally very little.[4]  As a practical matter, Mr. Luzon is very unlikely to reoffend.  The Sentencing Commission has found

---

4    Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, __ Criminology ___ (forthcoming 2009). Variations in prison and probation time "have no detectable effect on rates of re-arrest."  Id.  "Those assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame." Id.  In other words, "at least among those facing drug-related charges, incarceration and supervision seem not to deter subsequent criminal behavior." *Id.* The reason for this is that potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentence consequences in the manner one might expect of rational decision makers. Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006). One study states: "There is generally no significant association between perceptions of punishment levels

that "[t]here is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." *See* USSC, Measuring Recidivism at 15, http://www.ussc.gov/ publicat/Recidivism_General.pdf.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence

---

and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* At 2. The report concluded, "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. At 1. According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

General deterrence is based, in part, on creating or enhancing a particular individual's sentence based on the prospect, entirely speculative and inchoate, of influencing some unknown future wrongdoer who has not committed, or perhaps even contemplated, a crime.   A person should receive the sentence *they* deserve, without significant consideration for what some other future, unknown person may deserve.  *See* Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of punishment*?, 31 Crime, Law & Social Change 347 (1999) (hereinafter "*Beating a dead horse*"), at 355 ("[m]ost assuredly, the assumption that a lesser increase in the rate of incarceration would have caused an inflated rate of offending is *just that –* an *assumption* or assertion *which cannot be demonstrated* except with data that make a great many assumptions about how individuals *might* behave given some set of *hypothetical* circumstances ") (emphasis in original).

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.   The report, commissioned by the British Home Office, examined penalties in the United States as

well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id*. At 2. The report concluded, "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. At 1.

Similarly, an extensive report issued in 2015 by the Brennan Center for Justice (at New York University School of Law) concluded that, controlling for other variables, incarceration rates have increased to such an extent in the United States that they have not played a role in crime reduction for many years.  See Dr. Oliver Roeder, Lauren-Brooke Eisen & Julia Bowling, *What caused the Crime Decline*?, Brennan Center for Justice, at 7 (February 26, 2015) (hereinafter "*Brennan Report*") ("the current exorbitant level of incarceration has reached a point where diminishing returns have rendered the crime reduction effect of incarceration so small, it has become nil").  Synthesizing data from the past few decades with recently collected data, the *Brennan Report* determined that "incarceration has been decreasing as a crime fighting tactic since at least 1980…[and s]ince approximately 1990, the effectiveness of increased incarceration on bringing down crime has been essentially zero." *Id.* at 23.

**Table 2: Crime and Incarceration Rates (1990-2013)**

| | 1990-2013 | 1990-1999 ("1990s") | 2000-2013 ("2000s") |
|---|---|---|---|
| **Violent Crime** (murder, non-negligent manslaughter, forcible rape, robbery, aggravated assault) | 50% decline | 28% decline | 27% decline |
| **Property Crime** (burglary, larceny-theft, motor vehicle theft) | 46% decline | 26% decline | 25% decline |
| **Imprisonment** | 61% increase | 61% increase | 1% increase |

*Sources: Federal Bureau of Investigation, Uniform Crime Reports; U.S. Department of Justice, Bureau of Justice Statistics.*[13]

*Id.*

This lack of correlation between crime reduction and heightened incarceration rates is apparent from the simultaneous declines in state prison populations and crime rates in those states. *See Brennan Report*, at 27 (imprisonment and crime decreased by more than 15% in New York, California, Maryland, New Jersey, and Texas, which account for "more than 46 percent of the US population"). The *Brennan Report* cites the overestimation of the deterrent effect of heavy penalties as one possible factor in the ineffectiveness of incarceration as a crime reduction tool. *See Id.* at 26 (relying in part on the National Academy of Sciences report that concluded "insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects").



Changes in State Imprisonment and Violent Crime (2000-2013)



**Figure 2: Incarceration and Crime Rates (1980-2013)**

*Source: Federal Bureau of Investigation, Uniform Crime Reports; U.S. Department of Justice, Bureau of Justice Statics.*[22]

*Id.*

For Mr. Luzon, a sentence of 84 months would specifically deter him from any further criminal conduct.  Recognizing that Mr. Luzon is not requesting a non-custodial sentence in this instance, the idea that for specific deterrence a sentence of 7 years is likely to suffice for Mr. Luzon.  In fact, according to "the best available evidence"

imprisonment does not "reduce recidivism more than non-custodial sanctions."  Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) *See also* Gary Kleck, et. al. *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Michael Tonry, *The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*, 38 Crime and Justice: A Review of Research 102 (2009).

Justice Kennedy concurred during Congressional testimony, as *The Wall Street Journal* reported that, "in many instances, [Justice Kennedy] said, it would be wiser to assign offenders to probation and other supervised release programs."  Jess Bravin, "Two Supreme Court Justices Say Criminal Justice System Isn't Working," *The Wall Street Journal*, March 14, 2015, available at http://www.wsj.com/article_email/tow-supreme-court-justices-say-criminal-justice-system-isnt-working-1427197613-1MyQjAxMTA1NTIzNDUyNTQyWj.

Justice Kennedy added, "This is cost-effective,' he said, even 'without reference to the human factor' involved in incarceration.  'We have very low recidivism rate for those who are on release.'" *Id.*  The points made by Justice Kennedy paint the backdrop for the question of what length of sentence is sufficient but is not unnecessary for the purposes of sentencing.

This Court, after considering the need to deter Mr. Luzon through specific deterrence and others similarly situated individuals through general deterrence, should find that a sentence of 84 months is sufficient, but not greater than necessary based on the need to provide adequate deterrence.

**(C) to protect the public from further crimes of the defendant**

Offenders are most likely to recidivate when their sentence is straight prison than when the sentence is probation or a split sentence, and drug treatment programs and educational opportunities are likely to have a high cost-benefit value. *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) (hereinafter "Measuring Recidivism")[5].

In 1996, The Sentencing Commission staff drafted a document entitled *Sentencing Options under the Guidelines*, that acknowledged non-prison sentences are associated with less recidivism than prison sentences, and that "[m]any federal offenders who do not currently qualify for alternatives have relatively low risks of recidivism compared to offenders in state systems and to other federal offenders on supervised release," and that "alternatives divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties."   U.S. Sentencing Commission, Staff Discussion Paper, *Sentencing Option under the Guidelines* (Nov. 1996), http://www.rashkind.com/alternatives/dir_00/USSC_sentencingoptions.pdf.

In 1994, the Bureau of Prisons concluded that, for 62.3% of federal drug trafficking prisoners who were in Criminal History Category I, guideline sentences were costly to taxpayers, had little if any incapacitation or deterrent value, and were likely to negatively impact recidivism.  *See* Miles D. Harar, *Do Guideline Sentences for Low-Risk Drug Traffickers Achieve Their Stated Purpose?*, 7 Fed. Sent. Rep. 22, 1994 WL 502677 (July/August 1994).

According to a June 2012 study by the Pew Center on the States, entitled *Time Served – The High Cost, Low Return of Longer Prison Terms* (hereinafter "*Pew Report*),

---

Available at http://www.ussc.gov/publicat/Recidivism_General.pdf.

which analyzed state data reported to the federal government between 1990 and 2009, "offenders released in 2009 served an average of almost three years in custody, nine months or 36 percent longer than offenders released in 1990. The cost of that extra nine months totals and average of $23,460 per offender." *Id.* at  2, available at http://www.pewstates.org.uploadedFiles/PCS_Assets/2012/Prison_Time_Served.pdf.

Also, the *Pew Report* found that "for offenders released in 2009 after serving prison sentences for drug crimes: 2.2 years in prison, up from 1.6 years in 1990 (a 36%increase)." *Id*. at 3. Nor, with respect to many offenders, was there a correlation between the longer imprisonment and improved public safety.  As the *Pew Report* concluded:

> [d]espite the strong pattern of increasing length of stay, the relationship between time served in prison and public safety has proven to be complicated.  For a substantial number of offenders, there is little or no evidence that keeping them locked up longer prevents additional crime.

*Id*. at 4. *See also Id*. ("[a] new Pew analysis conducted by external researchers using data from three states –Florida, Maryland and Michigan – found that a significant proportion of nonviolent offenders who were released in 2004 could have served shorter prison terms without impacting public safety").

For myriad reasons, Mr. Luzon is very unlikely to pose a danger to the community on his release.  This was an isolated event that occurred among close friends. Mr. Luzon was not and never will be a threat to the community as a whole.  And, to the extent that Mr. Luzon's action resulted in harm to another, it was not his intent to do so. His remorse, the lessons he has learned, and the punishment and rehabilitation that will

occur as a result of this offense all lead to the virtual guarantee that this is Mr. Luzon's first and last run-in with law enforcement.

Therefore, 84 months is sufficient, but not greater than necessary, to protect the public from further crimes of Mr. Luzon.

### (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

Congress specifically provides that a sentence must take in to consideration correctional treatment when fashioning an appropriate sentence.  Mr. Luzon will benefit from drug, medical and psychological treatment.  He was already involved in programs that were helping him prior to his mandatory detention after his plea.  However, he must now rely on the Bureau of Prisons to provide the needed treatment during his incarceration when can return to the community and continue a treatment program.

Mr. Luzon is a drug addict.  His addiction is longstanding and has proven to be the single sole cause of his current situation.  The disease of addiction had so firmly grasped Mr. Luzon's life that it took over his decision-making.  But, he now has the opportunity to continue his sobriety, found after his arrest.  It took this case to rip him out of the altered state he found himself in.  It was the wake up call he needed, and he is in some ways thankful for this.  Although, he wishes with all his heart that it could have happened another way.  Mr. Luzon needs help with his drug addiction.  He is requesting that this Court recommend the RDAP program, even though he may not receive credit.  It is the treatment he seeks not the time off his sentence.  In any event, Mr. Luzon already started down the path of recovery while on bail.  Additional treatment in prison will help maintain and grow his toolkit for fighting his addiction. He will be better prepared for continuing his treatment more aggressively when he is out of prison and able to take

advantage of treatment that he will never receive while in custody.

In addition to the drug treatment, Mr. Luzon has many psychological and emotional issues he has to deal with.  He understands his actions and the situation he finds himself in.  He accepts his circumstances openly and realizes this is all happening for a reason.  But, the sadness, regret, remorse, fear, and pain he feels over this situation and the burdens he has carried from childhood need to be explored.  Again, while he was on bail he started that process of identifying the sources of his issues and began the healing process.  It is ongoing and he will need the assistance of mental health treatment to assist him in preparing for a life that will certainly be productive and beneficial to others.  Thus, we request the Court to recommend mental health treatment to the extent it is available at his BOP facility.

Finally, Mr. Luzon faces a multitude of health issues.  He has struggled mightily while in custody during this case to get treatment that even approaches humane medical care.  The lack of services and general disregard for serious medical issues is appalling. Yet, Mr. Luzon carries on and hopes that medical care in the facility where he is going is at least adequate.

It is clear that each of the three categories of services, drug treatment, mental health treatment and medical care or more substantial and really only available in a very meaningful way outside of prison.  Congress, the Sentencing Commission and the BOP have all plainly stated that prison is not a place to get rehabilitation; it is a place to send people for punishment.  So, while Mr. Luzon recognizes he must be punished, that must be weighed with the reality that Mr. Luzon will leave prison one day and it would be better for him to leave prison sooner rather than later so that he can receive the treatment

48

he needs to be a successful member of society.

Therefore, 84 months is sufficient but not greater than necessary to punish Mr. Luzon while BOP provides the defendant with needed drug rehabilitation, mental health treatment and medical care to the extent available, but keeping an eye towards weighing that time against the need to release Mr. Luzon in a period where he gains significantly from community treatment.

**3.      The Kinds of Sentences Available**

In *Booker*, the Supreme Court severed and excised 18 U.S.C. § 3553(b), the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guidelines range. *Booker,* 125 S. Ct. at 756.  This renders the sentencing guidelines advisory. *Id.*

Mr. Luzon faces no mandatory minimum.  The Court may sentence Mr. Luzon to any sentence including probation.  Mr. Luzon requests that this Court grant a variance from the suggested guideline range and impose a sentence of 84 months.

**4.      The Sentencing Range Established by the Sentencing Commission**

The Plea Agreement and the Presentence Report calculate a guideline range of 168-210 months. Probation suggests a sentence of 144 months.  Nonetheless, for the reasons stated, Mr. Luzon believes the guideline range is significantly more severe than necessary to accomplish the goals of sentencing and requests a sentence of 84 months.

**5.      The Need To Avoid Unwarranted Disparities**

Section 3553(a)(6) requires the Court to impose a punishment that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." As explained below, even a sentence of 144 months is

out of line with comparable sentences imposed in similar cases and even in cases with far more egregious facts. Below are a sample of sentences imposed (and the underlying facts) in drug cases where an overdose resulted. Based on the following, it is hard to see how a sentence of 144 months would not result in an unwarranted sentence disparity.

The U.S. Attorney's Office for the District of Connecticut has led the way in the number of death-resulting heroin prosecutions. In January of 2016, that office announced an "initiative targeting narcotics dealers who distribute heroin, fentanyl or opioids that cause death or serious injury to users." April 13, 2016 D.O.J. Press Release, available at https://www.justice.gov/usao-ct/pr/statewide-initiative-targets-distributors-heroin-and-opioids-cause-overdose-deaths. Between 2016 and 2017, at least 39 defendants have been sentenced for a drug distribution charge related to an overdose.   Attached as Exhibit 1, in chronological order, are 39 press releases from relevant District of Connecticut cases. These cases are a useful point of reference in determining sentences received by "defendants with similar records who have been found guilty of similar conduct."

The average sentence for a defendant held responsible for distributing drugs that resulted in an OD in the District of Connecticut is 35 months' imprisonment. This 35-month average includes sentences for defendants who maintained firearms (see, e.g., 4/24/2017 Press Release, Daniel Gamero sentenced to 72 months' imprisonment for distribution of heroin linked to at least two overdose deaths; a search of his home uncovered a loaded firearm) and, more significantly, defendants who exhibited a far higher degree of disregard for human life than Mr. Luzon.  For example, an August 12, 2016 press release reports a 71-month prison sentence for Bradley Commerford, a defendant with a prior felony record, who sold drugs that caused three overdose deaths.

Commerford knew the drugs he sold were tainted and elected to continue selling them, including to a 16 year old customer.

A November 29, 2016 press release summarizes the sentence of Frank Pina, a defendant whose prior record included "multiple state felony convictions and a federal felony drug conviction." Pina's drug-dealing caused 17 overdoses in a single day, three of which were fatal. Like Commerford, Pina knew the drugs he sold were tainted. As explained by the U.S. Attorney's Office, "Anytime there is a loss of life involving a drug overdose it is a tragic event; but even more so in this case given the number of victims in less than one day. … [Commerford] spent three days in the hospital having overdosed on the same toxic mixture. His crime is all the more shameful as he was fully aware of the acute danger of the cocaine he was peddling. His actions reflect a callous disregard for human life and were motivated solely by profit." Pina received a sentence of 87 months' imprisonment—81 months less than the bottom-end of Mr. Hawkins' advisory guidelines range.

Similarly, federal "death-resulting" drug prosecutions in New York result in sentences in line with the requested 84-month sentence, even where the underlying facts involve conduct more dangerous and callous than Mr. Luzon. *See United States v. Jonathan Santiago*, 15 CR 879 (SDNY) (AKH) (84 months' imprisonment); *United States v. Najon Flanders*, 15 CR 879 (SDNY) (AKH) (87 months' imprisonment); *United States v. Roosevelt Williams,* 16 CR 464 (NSR) (144 months' imprisonment); *United States v. Edward Carrillo*, 16 CR 617 (EDNY) (BMC) (126 months' imprisonment); *see also United States v. Lakuan Rhyne*, 15 CR 5 (NSR) (186 months for defendant, with prior record, who was responsible for distributing over a kilogram of heroin, including

the distribution of fentanyl-laced heroin that resulted in the overdose death of 23-year-old Thomas Coogan); *United States v. Anthony Delosangeles*, 16 CR 634 (84 months' imprisonment for defendant who sold fatal dose of heroin to 25-year-old Thomas Cipollaro after Mr. Cipollaro told Delosangeles that Mr. Cipollaro had just completed detox and rehab); *United States v. Craig Oleksowicz*, 13 CR 3 (ER) (120 month sentence for defendant in the business of selling powerful prescription painkillers whose distribution was responsible for the overdose death of two young men, aged 20 and 21).

Nationwide, sentencing involving a "death-resulting" case where the information is reported, the guidelines are 168-210 months, and where the defendant is in criminal history category I, an average sentence of 94 months is handed down. That includes the most egregious case to cases similar in nature to Mr. Luzon. Exhibit 2.

Ultimately, a sentence of 84 months is in line with sentences handed down for individuals who are similarly situated to Mr. Luzon. A sentence above 84 months is greater than necessary and creates an unwarranted sentencing disparity.

### 7. The need to provide restitution to any victims of the offense

In this case, there is an outstanding restitution amount in the neighborhood of $85,000.00. Mr. Luzon does not dispute that there is restitution that he owes to the family of Mr. Tramiel. However, Mr. Luzon would respectfully request a restitution hearing on this matter to take place in the future.

### Conclusion

Since the start of the so-called war on drugs, time and time again, we have seen law enforcement use "tough on crime" statutes to extract massively long prison sentences from drug dealers in an effort to eradicate narcotics from the streets. Historically, these

efforts have been an epic failure. They have resulted in mass incarceration of staggering numbers. And, these efforts have done nothing to stop drug abuse or drug-related overdoses.

In the Federal system in response to a crack-epidemic, Congress passed the Anti-Drug Abuse Act of 1986 and mandatory guidelines penalizing crack-cocaine 100 times more harshly than powder cocaine. Over 80% of crack offenders were black, and as a result, our federal prison population also disproportionately swelled with people of color. After a national outcry and study after study establishing that the crack-cocaine disparity had no empirical basis and unfairly and disproportionately targeted black and Latinos, in 2007 Congress began reducing the length of crack sentences.

Now in response to the opioid epidemic, we are seeing the Sentencing Commission and the U.S. Attorney's office ratcheting up sentences for cases resulting in death. The government surely will argue—as those before it did when enacting the Rockefeller Drug Laws and advocating for harsh crack-cocaine sentences—that a long sentence is necessary to respond to the alarming growth of fentanyl and heroin overdose deaths in this country. The government may argue that a guidelines sentence is necessary to deter other others and to prevent senseless deaths like Mr. Tramiel's in the future. But, we have heard this story before. Drug war proponents have been repeating the deterrence mantra for over 40 years, and yet drugs are cheaper, stronger, and more widely available than at any other time in U.S. history.   See Attachment 3.

If history has taught us anything it is that imprisoning Mr. Luzon for 12 years is not going to push back the epidemic sweeping this nation. An additional 7 years in jail will not bring Mr. Tramiel back. It is not necessary to deter Mr. Luzon from future drug

use; he already has lost everything because of this. 84 months is sufficient. Anything more is far greater than necessary. 18 U.S.C. § 3553(a).

In light of all of the foregoing, we respectfully ask that the Court employ proportionality, reason, and compassion and sentence Mr. Luzon to 84 months.

Respectfully submitted this 7th Day of March, 2018.

s/ Jeffery Greco_____
Jeffery Greco, Esq.
Greco Neyland PC
535 5th Avenue
25th Floor
New York, NY 10017

## CERTIFICATE OF SERVICE

I do hereby certify that on March 7, 2018, a copy of the foregoing document was filed under seal with a copy forwarded to all interested parties through email.

s/ Jeffery L. Greco